61 Mass. App. Ct. 171 (2004)                    171

Framingham Heavy Equipment Company, Inc. *v.* John T. Callahan & Sons, Inc.

FRAMINGHAM HEAVY EQUIPMENT COMPANY, INC. *vs.* JOHN T.
CALLAHAN & SONS, INC., & another.[1]

No. 02-P-1159.

Essex. November 12, 2003. - May 11, 2004.

Present: DUFFLY, DREBEN, & KAFKER, JJ.

*Contract,* Subcontract, Performance and breach, Condition precedent. *Interest.*
*Practice, Civil,* Interest, Attorney's fees.

In an action for breach of contract arising from the defendant general
contractor's failure to pay the plaintiff subcontractor for work done on a
construction project, no clear precondition to payment was set forth in
either the subcontract provision requiring the general contractor to pay the
subcontractor progress payments within three working days after the
general contractor received payment from the project owner, or a provision
of the general contract requiring the general contractor to pay each
subcontractor out of the amount paid to the contractor on account of each
subcontractor's portion of the work [175-177]; however, the judge cor-
rectly concluded that even if such a condition precedent existed, the general
contractor was in breach of the contract, because work under a construc-
tion change directive was treated specially under the contract documents,
and the judge's finding that, at least by the end of April, 1999, the general
contractor had exceeded any reasonable period of time for payment was
not clearly erroneous [177-179]; moreover, because of the general
contractor's breach, the judge properly excused the subcontractor from
further performance under the contract [179-180].

In a civil action for breach of a construction subcontract involving many
demands for payment and several breaches, so that neither the date of
demand nor the date of breach was established, the judge properly used the
date of the commencement of the action in calculating prejudgment inter-
est on the damages award pursuant to G. L. c. 231, § 6C. [180-181]

This court awarded attorney's fees for the appeal in a civil action for breach
of a construction subcontract, and directed the parties to follow the
procedure set forth in *Fabre* v. *Walton,* 441 Mass. 9, 10-11 (2004). [181]

CIVIL ACTION commenced in the Superior Court Department on
October 6, 1999.

[1]United States Fidelity & Guaranty Company. The defendants, who are the
general contractor and its surety, filed a joint brief.

The case was heard by *Richard E. Welch, III,* J.

*John J. McGivney* (*Scott A. Aftuck* with him) for the defendants.

*Alvin S. Nathanson* for the plaintiff.

DREBEN, J. In December of 1997, the plaintiff, Framingham Heavy Equipment Company, Inc. (Framingham), an excavation subcontractor, entered into a written contract with a general contractor, John T. Callahan & Sons, Inc. (Callahan), to perform certain site work at the Lynn English High School for $594,000. At that time Callahan already had entered into a contract with the city of Lynn (city) for renovations and an addition to the school. Even before the subcontract was signed, unforeseen site conditions, including discovery of large quantities of peat and other materials unsuitable for a building foundation, were discovered beneath the site,[2] which, as the excavations progressed, required extensive work beyond the scope of the subcontract. Although Framingham demanded payment for these and other changes, and although Callahan applied for payment for most of these changes from the city, by January 15, 1999, Framingham had received only a very small portion of the amount requested. On that date it brought this action claiming that Callahan was in breach of contract and seeking damages (alternatively in quantum meruit) of "at least $678,757.94," most or all of which was for work required by changes requested by the general contractor or the city's architect. The amount sought included work performed pursuant to a "construction change directive," a matter discussed later in this opinion. Callahan counterclaimed, alleging that it was Framingham, rather than Callahan, who was in breach of contract by walking off the job. After a four week jury-waived trial, a judge of the Superior Court, in a careful and well-reasoned memorandum, found Callahan in breach for nonpayment, excused Framingham from further performance, and entered a judgment for Framingham which, as amended, included damages of $572,049.64, of which all but $6,500 was for changes not covered in the original contract. He also awarded prejudgment interest of $186,568.18

---

[2]In order to obtain Framingham's signature on the proposed subcontract, modifications were inserted to reflect some of the necessary changes.

from the date of the filing of the lawsuit, attorney's fees, and costs.

The defendants appeal, claiming that Callahan was not in breach because the subcontract included "pay when paid" provisions that required Callahan to pay Framingham only after it received payment from the city, and that even if the subcontract did not include such provisions, Callahan was entitled to a reasonable time to obtain payment from the city. They also claim that the judge erred in excusing Framingham from continuing to perform the work required under the contract documents and in awarding interest from the date the action was commenced. We affirm.

1. *Facts.* We take our facts from the findings of the trial judge, supplemented on occasion by undisputed testimony or exhibits. Framingham began work on the project in late October or early November, 1997. As previously indicated, unsuitable soil conditions required far more site work than originally anticipated. Framingham's work was supervised on nearly a daily basis by Callahan's job superintendent and by its project supervisor as well as by a "clerk of the works" employed by the city's architect. All of these individuals were aware of the unsuitable materials which had been discovered underneath the proposed building addition and also in utility trenches.

In November, 1998, a construction change directive (CCD) was issued by the city and its architect for the removal of the unsuitable soil in the utility trenches.[3] Under the CCD, the unit prices per cubic yard for the excavation and disposal of unsuitable soils and for replacement fill and stone were set at the same rate as under the original subcontract. On December 3, 1998, Callahan wrote to Framingham stating, inter alia, that (1) the CCD "guarantees that compensation will be made at least for

---

[3]A construction change directive is defined in Article 7.3.1 of the General Conditions, see note 10 and accompanying text, *infra*, as "a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work and stating a proposed basis for adjustment, if any, in the Contract Sum or Contract Time, or both." Article 7.3.2 states that "[a] Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order." See note 13, *infra*, defining "change order."

the values presented"[4]; (2) daily slips for the excavation of the peat were to be signed by the clerk of the works to "guarantee payment"; and (3) Framingham was to provide "the width of the trenches" in order to calculate the cubic yardage of material. Callahan had also written Framingham that the architect indicated he would allow the certified work in progress to be requisitioned monthly.

The work was performed, some of the daily work slips contained the width of the peat removed while some contained the depth, and the slips were signed by the city's clerk of the works. Framingham requisitioned payment for this work on December 17, 1998; January 4, 1999; January 15, 1999; and on February 16, 1999, by which time the excavation on the utility trenches had been completed.[5] The February 16 requisition documents explicitly set forth the cubic yardage of peat removed and fill provided and sought an amount which, together with the previous requisitions, totaled $180,266. Callahan in its December, 1998 and February and March, 1999 applications for payment included a line item for the CCD work. The city, however, struck the line item in these applications and on the March application noted "No CCD's." After the architect recommended approval of payment for the CCD work,[6] Callahan again sought payment from the city, but the city once more struck the line item.[7]

By late February or early March, 1999, subcontractors in other trades were working in areas requiring excavation. As a

---

[4]Framingham had sought a higher rate and reserved its right to pursue its claim for such higher rate.

[5]The December 17, 1998 requisition was for $25,300; the January 4, 1999 requisition was for $35,650; and the January 15, 1999 requisition was for $92,667.24. Each requisition subsequent to December 17 included the previous requisitions, none of which had been paid.

[6]The architect asked the city's consulting engineer to review Callahan's payment request materials and received his recommendation on March 5, 1999, which reduced Framingham's claim by approximately $2,000. The architect recommended approval of the reduced amount on March 8, 1999.

[7]Although the judge stated that "[t]here is no evidence that Callahan made any special efforts to obtain a prompt interim payment for this work," the record indicates that Callahan repeatedly sought payment. The judge's error is not material to our decision and is understandable in view of the length of the trial and the multitude of exhibits. The record on appeal consists of twenty volumes.

result, Framingham was running out of work and needed to move its equipment from the site and return later to finish the work. Framingham, with no protest from Callahan, removed its equipment.

At the time it took away its equipment, Framingham had not received any payment for its work under the CCD despite repeated requests. Its March, 1999 requisition shows claims for additional work of $76,184.14, so that the total claimed for changes, including the CCD work, was $754,944.14. No payments were received from Callahan[8] in April, and on April 30, 1999, Framingham sent a letter to Callahan again demanding payment for the CCD and other work, asserting that Callahan's failure to pay was a breach of the subcontract. The judge agreed, stating that "at least by the end of April, 1999," Callahan was in breach of its contract with Framingham.

Although it did not send any money, Callahan continued to call Framingham to return to the site, and in June, 1999, requested documentation concerning the location where peat had been delivered and other information apparently sought by the city concerning the work covered by the CCD. The judge found that Framingham's owner by this time was disgusted, and that he did not respond. On June 22, 1999, Callahan sent Framingham a letter stating it was terminating the subcontract. The next day Framingham wrote Callahan asserting that it, rather than Framingham, was in breach.

2. *"Pay when paid" claim.* Callahan's primary claim on this appeal is that it was not in breach of contract for not paying Framingham because the subcontract documents contained "pay when paid" provisions, that is, payment to Callahan by the city was a condition precedent to payment by Callahan to Framingham. We are mindful that in construing such a contract, a condition precedent to payment may not be inferred; the contract must clearly state "that payment to the subcontractor is to be directly contingent upon the receipt by the general contractor of payment from the owner." *A.J. Wolfe Co.* v. *Baltimore Contractors, Inc.,* 355 Mass. 361, 365-366 (1969). See *Jer-*

---

[8]Callahan also failed to make a progress payment to Framingham for work completed in March, 1999, and for which Callahan was paid by the city in the beginning of May.

*emiah Sullivan & Sons* v. *Kay-Locke, Inc.*, 17 Mass. App. Ct. 997, 998 (1984); *Canam Steel Corp.* v. *Bowdoin Constr. Corp.*, 34 Mass. App. Ct. 943, 944 (1993). In the absence of such a direct contingency, provisions should be viewed "only as postponing payment by the general contractor for a reasonable time after requisition . . . so as to afford the general contractor an opportunity to obtain funds from the owner." *A.J. Wolfe Co.* v. *Baltimore Contractors, Inc., supra* at 366.[9]

The subcontract was based on AIA Document A401, Standard Form of Agreement Between Contractor and Subcontractor (1987 edition) and AIA Document A201, General Conditions of the Contract for Construction (1987 edition) (General Conditions).[10] Pointing to the provisions of the printed forms, Callahan argues that Article 11.3 of the subcontract together with Article 9.6.2 of the General Conditions constitute "pay when paid provisions." Article 11.3 of the subcontract requires the contractor to pay the subcontractor "each progress payment within three working days after the Contractor receives payment from the Owner," and Article 9.6.2 of the General Conditions requires the contractor to "promptly pay each Subcontractor, upon receipt of payment from the Owner, *out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work*, the amount to which said Subcontractor is entitled . . ." (emphasis supplied). Callahan lays stress on the emphasized portion of Article 9.6.2. We do not consider that the two articles set forth a clear precondition to payment. They are no stronger in favor of a contingent payment to the subcontrac-

---

[9]In the *Wolfe* case, upon approval of the subcontractor's requisitions by the general contractor and the owners, payment was to be made "within 10 days after" payment from the owners was received by the general contractor. *A.J. Wolfe Co.* v. *Baltimore Contractors, Inc.*, 355 Mass. at 365. The subcontract also contained an article that the general contractor "shall be free to make payments" to the subcontractor "on account of the subcontract price, in such additional amounts and at such other times" as the general contractor "may elect." *Id.* at 365 n.7.

[10]AIA refers to American Institute of Architects. The General Conditions, as well as some Supplementary General Conditions, are part of the contract between Callahan and the city and are expressly made a part of the subcontract.

Article 2.1 of the subcontract provides, inter alia, that the subcontractor shall assume toward the contractor all the obligations that the contractor assumes to the owner insofar as applicable.

tor than the language in *A.J. Wolfe Co.* v. *Baltimore Contractors, Inc.*, *supra*, where payments by the contractor to the subcontractor were held to be mandatory even though the contract provided for optional payments by the contractor, i.e., payments that could be made in the event moneys had not been received from the owner. See note 9, *supra*.

The last sentence of Article 11.3 of the subcontract also undercuts Callahan's argument. It provides: "If the Architect does not issue a Certificate for Payment or the Contractor does not receive payment for any cause which is not the fault of the Subcontractor, the Contractor shall pay the Subcontractor, on demand, a progress payment computed as provided in [Articles] 11.7 and 11.8."

3. *Callahan was in breach of contract.* Noting that even if the contract were to be viewed as containing "pay when paid" provisions, the trial judge determined, and we agree, that work under a CCD was treated specially under the contract documents.

Article 11 of the subcontract deals with progress payments. These, under Article 11.1, are based on applications for payment submitted by the subcontractor to the contractor "corresponding to Applications for payment submitted by the Contractor to the Architect, and Certificates for payment issued by the Architect." Article 11.7.1 in relevant part specifically provides:

> "Pending final determination of cost to the Contractor of changes in the Work which have been properly authorized by Construction Change Directive, amounts not in dispute may be included [in requests for payment] to the same extent provided in the Prime Contract [between the owner and the general contractor], *even though the Subcontract Sum has not yet been adjusted*" (emphasis supplied).

Article 9.3.1.1 is the corresponding provision of the General Conditions.[11]

Although the judge made extensive findings on the issue of damages concerning the various other changes and unforeseen

---

[11]Article 9.3.1.1 of the General Conditions provides: "Such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives but not yet

conditions for which Callahan had failed to pay Framingham, in determining that Callahan had breached the contract, he focused on the work performed under the CCD and also on a small progress payment ($6,500) that Callahan did not pay Framingham within three days after Callahan received it.[12] While acknowledging that Callahan "would be implied to have a reasonable period of time to make" the payment under the CCD, the judge, as indicated earlier, found that "at least by the end of April," Callahan had exceeded any reasonable period of time for payment.

Callahan claims this finding is clearly erroneous. It points to Callahan's requisitions and to the fact that a change order was obtained in July, 1999, within four months of Callahan's March requisition.[13] However, Callahan misconstrues the contract provisions and ignores the fact that Framingham had requisitioned and was entitled to payment as it completed portions of the work beginning at a reasonable time after December 17, 1998. Callahan also makes no mention of its December 3, 1998 letter saying the CCD "guarantees" compensation and its note to Framingham that the architect had stated that he would allow monthly requisitions. Callahan submitted Framingham's requisitions to the city. Under Articles 11.3 and 11.7.1 of the subcontract, both quoted *supra*, Framingham was entitled to

included in Change Orders [when such Construction Change Directives have set forth an adjustment to the Contract Sum]."

At oral argument before the panel, Callahan noted that no adjustment to the contract sum had been made and, pointing to the material we have put in brackets in Article 9.3.1.1, argued that Article 11.7.1 of the subcontract was superseded by the bracketed material. The Supplementary General Conditions amended the General Conditions by adding the bracketed material. Callahan's argument fails because the added material is inconsistent with Article 11.7.1 of the subcontract, and under Article 2.1 of that contract, "Where a provision of the Prime Contract [including general and supplementary conditions] is inconsistent with a provision of [the subcontract, the subcontract] shall govern."

[12]See note 8, *supra*. Callahan does not dispute the fact that this progress payment was not made, but claims it is insignificant considering the amount of the subcontract.

[13]A change order is defined in Article 7.2.1 of the General Conditions as "a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following: [1] a change in the Work; [2] the amount of the adjustment in the Contract Sum, if any; and [3] the extent of the adjustment in the Contract Time, if any."

61 Mass. App. Ct. 171 (2004)                    179

Framingham Heavy Equipment Company, Inc. *v.* John T. Callahan & Sons, Inc.

progress payments if Callahan's failure to receive payment from the city was not due to the fault of Framingham. The judge's finding that Callahan had failed to pay Framingham within a reasonable time for the CCD work performed in December and January and completed in the middle of February was not clearly erroneous.[14,15]

Callahan also challenges the judge's conclusion of breach by arguing that under Article 11.7.1 only amounts not in dispute authorized by a CCD may be requisitioned for payment, and the city was disputing the payment. However, there was no dispute between Callahan and Framingham as to the amount — Callahan had submitted the total amount claimed by Framingham under the CCD work and was not entitled to do so under the contract if it disputed the amount. This is so because Article 9.3.1.2 of the General Conditions provides that "applications [by the Contractor] may not include requests for payment of amounts the Contractor does not intend to pay to a Subcontractor or material supplier because of a dispute or other reason." The provision thus supports the conclusion that the subcontract refers to disputes between the general contractor and the subcontractor. Moreover, Articles 11.7.1 and 11.3 of the subcontract only make sense in this context. The parallel article of the General Conditions, Article 9.3.1.1, see note 11, *supra*, does not refer to disputed items.

Not only does Callahan's inclusion of Framingham's request show that it did not dispute the amount, but the judge also found "far from convincing" the claim that Framingham's February 16, 1999 invoice was disputed. For the reasons set forth in his memorandum, the judge's finding was warranted by the evidence.[16]

4. *Performance by Framingham excused.* Because of Callahan's breach, the judge excused Framingham from further

---

[14]Reasonable time, therefore, is not measured, as Callahan urges, by the time it takes to obtain a change order.

[15]In any event, as the judge correctly noted, Framingham was legally entitled to be paid under G. L. c. 30, § 39N, for the changed site conditions. That statutory provision is, as required, set forth in Article 4.3.6 of the Supplementary General Conditions.

[16]Callahan's additional argument that Framingham acted unreasonably in regard to the city's request for additional documentation, a request that was

performance. Moreover, he correctly pointed to Article 4.7.1 of the subcontract, set forth in relevant part in the margin,[17] which relieved the subcontractor from further performance. We agree that under both general principles of contract law, see *C.C. Smith Co.* v. *Frankini Constr. Co.*, 334 Mass. 379, 384 (1956), and Article 4.7.1 of the subcontract, Framingham was excused from continuing the work. Contrary to Callahan's contention, Article 4.3.4 of the General Conditions, set forth in the margin,[18] did not require Framingham to continue working without being paid. Framingham was entitled to payment under the CCD without waiting for a change order and, not being paid, was permitted to stop work. While Framingham's letter of April 30, 1999, did not strictly comply with the notice requirement and was not sent by certified mail, see Article 13.3.1 of the General Conditions, in the circumstances, there was substantial compliance with the requirements of notice, and the judge did not err in finding Framingham excused from further performance. In any event, Callahan's mere mention of Article 13.3.1 does not constitute argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

5. *Prejudgment interest.* The judge awarded interest from the date of the filing of the complaint. Callahan, citing G. L. c. 231, § 6C, set forth in the margin,[19] contends that prejudgment inter-

---

not made until May, after Callahan was in breach, was satisfactorily refuted by the trial judge in his memorandum.

[17]Article 4.7.1 of the subcontract provides: "If the Contractor does not pay the Subcontractor through no fault of the Subcontractor, within seven days from the time payment should be made as provided in this Agreement, the Subcontractor may, without prejudice to other available remedies, upon seven additional days' written notice to the Contractor, stop the Work of this Subcontract until payment of the amount owing has been received."

[18]Article 4.3.4 of the General Conditions provides: "*Continuing Contract Performance.* Pending final resolution of a Claim including arbitration, unless otherwise agreed in writing the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents."

[19]General Laws, c. 231, § 6C, as amended through St. 1982, c. 183, § 3, provides: "In all actions based on contractual obligations, upon a . . . finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand. If the date of the breach or demand is not established, interest shall

est should be added from the date of the breach which, it argues, the judge found to be at the end of April, 1999.

There were here many demands and several breaches, so that neither the date of demand nor the date of breach was established. Moreover, the judge did not find an exact date for the breach, saying that "at least by the end of April," Callahan had exceeded any reasonable time for payment. He properly followed the statutory provision by using the date of the commencement of the action. Cf. *Peabody N.E., Inc.* v. *Marshfield*, 426 Mass. 436, 445-446 (1998).[20]

6. *Attorney's fees.* Framingham has asked for, and under G. L. c. 149, § 29, is entitled to, reasonable attorney's fees for this appeal. *J.C. Higgins Co.* v. *Bond Bros.*, 58 Mass. App. Ct. 537, 541 (2003). If the parties cannot agree as to the payment and amounts of fees and costs, the parties are to follow the procedure set forth in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004); Framingham is to file its application for fees and costs, with any appropriate supporting materials, with the clerk of this court within fourteen days of the date of the rescript. Callahan is to file its opposition within ten days thereafter.

*Amended judgment affirmed.*

---

be added by the clerk of the court . . . from the date of the commencement of the action . . . ."

[20]We also note that Callahan can show no harm to it from the date chosen for the award of interest. Some of the demands for payment long preceded the filing of the lawsuit, e.g., for the site work that was completed under the addition to the building and for which Framingham requisitioned payment by August 31, 1998. The award of damages for that claim ($293,016 per the amended judgment) constitutes more than half of the total damage award. Thus, had the judge taken into account the actual demand dates for each of the claims for which he awarded damages, the total interest would have been higher.