CITY RENTALS, LLC vs. BBC Co., INC., & another.[1]

No. 09-P-1388.

Middlesex. May 12, 2010. - May 24, 2011.

Present: McHUGH, SMITH, & SIKORA, JJ.

*Statute,* Construction. *Public Works. Bond,* Public works. *Notice,* Timeliness. *Damages,* Attorney's fees.

At the bench trial of a civil action brought against a general contractor on a publicly funded construction project and the general contractor's surety, in which the plaintiff, a company supplying trucking services and heavy equipment to a subcontractor pursuant to an oral open account agreement, sought unsatisfied charges under the Commonwealth's labor and material payment bond statute, G. L. c. 149, § 29, the judge did not err in concluding that the plaintiff, by forwarding to the defendants an undifferentiated notice that communicated both the amount due and the recipient, had complied abundantly with the statutory purpose of meaningful notice and was not required to separate the elements of its labor, materials, equipment, or other contributions to the project into discrete units and then to transmit corresponding multiple notices [564-565]; further, there was no merit to the defendants' argument that the plaintiff's notice was untimely because it was received more than sixty-five days after the general contractor's last active use of the plaintiff's equipment, where the equipment had been appropriated by the general contractor on the work site until its release, which fell within the notice period [565-566].
A trial court judge's award of attorney's fees under the Commonwealth's labor and material payment bond statute, G. L. c. 149, § 29, did not constitute an abuse of discretion, where, although the fee award substantially outdistanced the damages judgment, the complexity of the case and the intensity of the defense warranted such an award, as adjusted to subtract certain fees that did not contribute to the successful § 29 claim. [566-569]

CIVIL ACTION commenced in the Superior Court Department on December 26, 2002.

The case was heard by *Bonnie H. MacLeod-Mancuso,* J., and an application for an award of attorney's fees was also heard by her.

*John J. McNamara* for the defendants.
*Steven Shane Smith* for the plaintiff.

[1]Centennial Insurance Company.

SIKORA, J. In this case we address the application of the Commonwealth's labor and material payment bond statute for publicly funded construction projects, G. L. c. 149, § 29 (bond statute). At the conclusion of a bench trial, a judge of the Superior Court found that a general contractor had detained certain construction equipment rented to a terminated subcontractor by a supplier; and that the general contractor had therefore rendered its surety company and itself liable under the statutory bond for rental charges accrued and unpaid until the time of the general contractor's release of the equipment. In addition, as directed by the statute, the judge awarded the supplier "reasonable legal fees" caused by the litigation. For the following reasons, we affirm both the judgment and the order awarding attorney's fees with a slight modification of the fees amount.

*Facts.* The reviewing court examines the findings of a bench trial under the "clearly erroneous" standard of Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). The following material facts emerge from the record as undisputed or as express or implied findings of the judge resting upon ample evidence.

In May of 2002, the town of Canton and the defendant BBC Co., Inc. (BBC), executed an agreement for BBC's performance as general contractor for the renovation and expansion of the Canton Public Library facilities (project). As required by the bond statute,[2] BBC as principal provided to the town a payment bond in the amount of $7,295,000 furnished by defendant Centennial Insurance Company (Centennial) as surety.[3] BBC immediately executed a subcontract with Kevton Corporation (Kevton) for the performance of site clearance and earthwork.

---

[2]In pertinent part, G. L. c. 149, § 29, first par., as appearing in St. 1962, c. 696, provides that "[o]fficers or agents contracting in behalf of . . . any . . . town . . . for the construction, reconstruction, alteration, remodeling, repair or demolition of public buildings . . . [for amounts greater than $2,000] shall obtain security by bond in an amount not less than one half of the total contract price, for . . . payment by [the] contractor and subcontractors of any sums due for the rental or hire of vehicles, steam shovels, . . . tools and other appliances and equipment employed in such construction, reconstruction, alteration, remodeling, repair or demolition . . . ."

[3]Under the main clause of the bond, "The Contractor [BBC] and the Surety [Centennial], jointly and severally, bind themselves . . . to the Owner [Canton] to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract . . . ."

The plaintiff City Rentals, LLC (City Rentals), supplies trucking services and heavy equipment to construction projects. At the request of Kevton, it entered an oral open account agreement by which it delivered services and equipment to the project upon twenty-four hour telephone notice. From late June to early August, City Rentals provided trucks and a trailer for removal of rock ledge, tree stumps, and other obstacles on the project site; excavation machinery; a bulldozer; and a four-wheel, front-end loader machine. After mid-August only the front-end loader remained at the project.

During that summer BBC became dissatisfied with the pace of Kevton's work. On October 2, it terminated the subcontract and reported that under the terms of the general contract and subcontract it would "take possession of all materials, [m]achinery, and tools of Kevton from the site to complete Kevton's work." A term of the general contract between the town and BBC and a corresponding term of the subcontract between BBC and Kevton authorized the general contractor to take possession of the equipment of a terminated subcontractor in order to complete the subcontractor's work. No term permitted the general contractor to seize equipment rented by the subcontractor from a third-party supplier. No evidence indicated that City Rentals had accepted the risk of the seizure of its equipment or had received any notice of the term in the general contract.

In early October, City Rentals made several efforts to recover the front-end loader from the site. It dispatched a low-bed truck to retrieve it. BBC personnel turned the truck away at the project gate. City Rentals' equipment manager made two telephone calls to separate BBC personnel at the site to arrange retrieval; each of the BBC personnel responded simply that BBC had seized all equipment used by Kevton. On at least three occasions during October and November, Kevton's general manager and its accountant visited the site to confirm the presence and the condition of the seized equipment. From outside the gate they took photographs of the front-end loader (admitted in evidence). On November 4, the City Rentals equipment manager again telephoned the BBC site manager to arrange for repossession of the loader; the site manager responded that the Kevton subcontract permitted BBC to seize the rental equipment on

site. The trial judge appropriately found that "City Rentals sought to recover its equipment from the project site, but was rebuffed in its attempts to retrieve the . . . loader until at least November 29, 2002."

In late November, Kevton brought suit (separate from the present litigation) against BBC in the Superior Court for, inter alia, conversion of Kevton's "personal and leased property, equipment and materials . . . on the [p]roject site," including the front-end loader, and for an affirmative injunctive order compelling the release of all seized equipment. On November 30, BBC released the equipment.

Meanwhile, on October 22, City Rentals had sent BBC written notice of an unpaid equipment rental balance through September 22 of $15,377.50, and indicated its intention to seek payment under the statutory bond, if necessary. BBC received, but did not answer, the notice.

On December 4, counsel for City Rentals forwarded to BBC and Centennial an updated claim for labor, material, and equipment of "no less than $30,857.50." BBC received, but again did not answer, the billing. Centennial acknowledged the notice, reserved its defenses, and proposed to investigate the claim.

On December 26, 2002, City Rentals began the present action against BBC and Centennial for unsatisfied rental charges of $35,910 payable under the statutory bond, and for violation of G. L. c. 93A.[4] After a long gestation, the parties conducted an efficient bench trial. The judge awarded City Rentals the full amount of its requested damages under the bond, $35,910, plus interest and costs. The judge rejected the c. 93A claim (a result not appealed). After examination of extensive subsequent papers (affidavits, verified time sheets, supporting and opposing memoranda), she entered a final order for attorney's fees in the sum of $78,136.75, as mandated by G. L. c. 149, § 29, sixth par.[5] Both assessments applied jointly and severally against BBC and Centennial. Both defendants have timely appealed.

---

[4]In addition to the claims against BBC and Centennial, City Rentals sued Kevton upon claims of breach of contract and quantum meruit. Those claims resulted in an uncollectible default judgment.

[5]"A decree in favor of any claimant under this section *shall* include reasonable legal fees based upon the time spent and the results accomplished as

*Analysis.* 1. *Liability.* Against the judgment of liability, BBC and Centennial (hereafter collectively BBC[6]) argue that City Rentals failed to provide notice sufficiently specific or timely under the requirements of G. L. c. 149, § 29. In relevant part, the third paragraph of the statute provides that a claimant engaged contractually with a subcontractor (but not with the general contractor) may pursue its remedy under the bond "only if [it] gives written notice to the contractor principal [the general contractor] within sixty-five days after the day on which the claimant *last* . . . furnished . . . equipment . . . , stating with substantial accuracy the amount claimed [and] the name of the party for whom such . . . equipment . . . [was] furnished . . ." (emphasis supplied). *Ibid.*, as amended by St. 1972, c. 774, § 5. BBC contends that City Rentals maintained four separate contractual relationships with Kevton: one for trucking and trailer services; one for an excavator; another for the bulldozer; and a final one for the front-end loader. It points out that City Rentals leased each category of equipment at different rates and that it invoiced them separately. It concludes that "City Rentals was required to give separate notices for [each of] the four separate and distinct subcontracts at issue"; that it should have particularly identified the front-end loader and its contested detention; and that the undifferentiated December 4 notice lacked the degree of specificity necessary under the statute.

Independently, BBC argues that the December 4 notice was untimely because the "idle" presence of the front-end loader on the project site did not constitute the requisite "furnishing" of equipment within the meaning of the statute. The last "furnishing" (active use) allegedly occurred on September 27. BBC received the notice on December 7. In BBC's view, the proposed interval of seventy-one days would place the notice beyond the sixty-five day limitation.[7] For several reasons both proposed applications of the statute are unpersuasive.

approved by the court . . ." (emphasis supplied). G. L. c. 149, § 29, as amended by St. 1972, c. 774, § 5.

[6]BBC and Centennial have appeared through the same counsel and acted as a unit throughout the trial and appellate proceedings. For ease of reference we use the name BBC to include both parties.

[7]BBC's contentions rest upon a view of the evidence that did not appear to convince the trial judge. Kevton's project manager testified that his company

a. *Substantial accuracy.* The statute does not impose a duty upon a claimant subcontractor to separate the elements of its labor, materials, equipment, or other contributions to a project into discrete units, and then to transmit corresponding multiple notices. As always, we begin with the language of the act itself. *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). It requires a statement of the "amount claimed" and the name of the party for whom the subcontractor "furnished" the elements of value. Here the City Rentals December 4 notice communicated both an amount ("no less than $30,857.50") and the recipient ("Kevt[]on Corp., a subcontractor to BBC Co., Inc."). That information satisfied the statute. In addition, City Rentals identified the project by title and address. It sent identical notices to both BBC and Centennial by certified mail. It complied abundantly with the statutory purpose of meaningful notice.

The mode of interpretation for the act is liberal. "The fundamental purpose of § 29 is to afford security to subcontractors and materialmen in public works because they do not have the benefit of a mechanic's or materialman's lien, as would be the case in private construction work." *Floors, Inc.* v. *B.G. Danis of New England, Inc.*, 7 Mass. App. Ct. 356, 358 (1979), *S.C.*, 380 Mass. 91 (1980). Section 29 is "a remedial statute, to be construed broadly to effect its purpose of affording security to subcontractors and materialmen on public works." *J.P. Constr. Co.* v. *Stateside Builders, Inc.*, 45 Mass. App. Ct. 920, 921 (1998), quoting from *LaBonte* v. *White Constr. Co.*, 363 Mass. 41, 45 (1973).

More specifically, the court in *Westinghouse Elec. Corp.* v. *J.J. Grace & Sons, Inc.*, 349 Mass. 664, 667-668 (1965) (*Westinghouse*), expressly rejected BBC's notion of segmented deliveries and separate claim notices within an ongoing relationship between a supplier and a subcontractor. By continuous individual purchase orders made by telephone, the plaintiff Westinghouse supplied a subcontractor with a stream of electrical materials

---

was using the front-end loader on the day of formal termination, October 2. He testified also that he had witnessed the successor subcontractor use it on site after October 2. The judge concluded that she need not find that the project owner or other contractor was using the claimant's equipment, but only that the claimant had complied with subcontract terms to make the equipment available on site.

through the course of construction of a school. *Id.* at 666. Under § 29, Westinghouse pursued payment from the general contractor and its surety. They characterized each purchase order as a separate contract and the scope of the bond as limited to only those supplies delivered within the (then ninety-day) limited period before service of notice. *Id.* at 667. The court held that "the record shows a continuing series of orders for a particular construction project. We do not believe that the Legislature intended that claimants who furnish materials be required to file a separate statement of claim for each item ordered under such an arrangement."[8] *Id.* at 668.

That authority eliminates the impracticable complexity of a system of mandatory separate notices for ongoing transactions between the same supplier and subcontractor within the confines of a single project. In both the *Westinghouse* case and this one, the participants met the needs of the project on a flexible day-to-day basis and not by multiple separate contracts and concomitant multiple claim notices. Over the course, pace, and variations of large projects, the complications of the latter system would needlessly proliferate among numerous suppliers, subcontractors, general contractors, and surety companies. The trial judge correctly rejected the contention.

b. *Untimeliness.* BBC's theory of late notice rests upon the premise that no furnishing of equipment occurred between City Rentals and the project after BBC terminated Kevton and took possession of the front-end loader. The judge found that City Rentals had made good faith efforts to recover the loader during October and November, and that BBC had blocked those efforts until the end of the second month. She correctly concluded (1) that those initiatives were a diligent attempt to mitigate the ongoing rental charges,[9] and (2) that the very availability of the loader, with or without use, amounted to sufficient furnishing of

---

[8]As City Rentals points out in the course of its thorough analysis, Federal decisions applying the analogous Miller Act, formerly 40 U.S.C. § 270b and now recodified as 40 U.S.C. § 3133 (2006), to Federally financed public construction projects have similarly rejected the proposal of requisite separate notices. See *United States* v. *Bregman Constr. Corp.*, 172 F. Supp. 517, 522-523 (E.D.N.Y. 1959); *United States* v. *George A. Fuller Co.*, 250 F. Supp. 649, 659-660 (D. Mont. 1966).

[9]The judge accurately distinguished two Miller Act decisions invoked by

equipment to the time of release so as to fall within the notice period of the bond. Uncontroverted evidence established that BBC had appropriated the front-end loader for the purpose of continuing the work of the terminated subcontractor and that it had kept it for that purpose.

Finally, as a consideration in the application of this statutory equitable claim,[10] we observe that the embargo of the loader for almost two months prevented City Rentals from any profitable use of it by alternative leases throughout that span. The claim under the bond functioned equitably as a means of compensation for that opportunity cost. The judge's determination of liability was correct as a matter of fact and law.[11]

2. *Attorney's fees.* After trial, City Rentals applied for an award of attorney's fees in the amount of $125,395.50. BBC proposed a reduction of the request by approximately fifty percent. After examination of the substantial supporting and opposing materials, the judge trimmed the request to an allowance of $78,136.75. BBC attacks that sum as still exorbitant.

The fee-shifting provision of § 29 "places the expense of litigation on a contractor and a surety who decline to pay a rightful claim [and] tends to achieve the legislative goal of expeditious payments to subcontractors." *Manganaro Drywall, Inc.* v. *White Constr. Co.*, 372 Mass. 661, 664 (1977). Under the act, as with most fee-shifting statutes, the amount of the award rests in the sound discretion of the trial judge. *J.P. Constr. Co.* v. *Stateside Builders, Inc.*, 45 Mass. App. Ct. at 921. The judge making the firsthand observation of the quality and necessary

---

BBC in this branch of its argument. Neither *United States* v. *Kelley*, 327 F.2d 590, 591-592 (9th Cir. 1964), nor *United States* v. *Fidelity & Deposit Co. of Md.*, 475 F. Supp. 672, 674 (E.D.N.Y. 1979), barred bond coverage to suppliers of terminated subcontractors by reason of termination alone, but did so because the suppliers failed to make timely efforts to give notice under the Miller Act or to recover their supplies so as to mitigate damages under the bond. See *United States* v. *Coastal Structures, Inc.*, 689 F. Supp. 1092, 1100 & n.20 (M.D. Fla. 1988) (interpreting *Kelley* and *Fidelity & Deposit Co. of Md.* as cases of failure to mitigate).

[10]General Laws c. 149, § 29, second par., as amended by St. 1972, c. 774, § 5, authorizes the commencement of the present action by "a petition in equity."

[11]On appeal, BBC is not challenging the amount of the damages award, $35,910, composed of unpaid billings for rental of the loader, excavator, and bulldozer, and for trucking and trailer services.

quantity of the parties' preparation and performance is uniquely situated to assess the reasonable value of those services.[12] See *Edgerly* v. *Commonwealth*, 379 Mass. 183, 188 (1979); *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 324 (1993).

The standard of review, therefore, is abuse of discretion. *WHTR Real Estate Ltd. Partnership* v. *Venture Distrib., Inc.*, 63 Mass. App. Ct. 229, 235 (2005), and cases cited. The appellate party challenging the award must demonstrate that the trial judge has traveled outside the boundaries of the range of reasonable alternative measures. *Fontaine* v. *Ebtec Corp.*, *supra.* See *Davis* v. *Boston Elev. Ry.*, 235 Mass. 482, 496 (1920) (abuse of discretion is action outside the spectrum of reasonable alternatives). As one general limitation upon discretion, we keep in mind that "when a party other than the one who hired the lawyer is required to pay the fee, conservative criteria are in order." *Price* v. *Cole*, 31 Mass. App. Ct. 1, 7 (1991), citing *Grimes* v. *Perkins Sch. for the Blind*, 22 Mass. App. Ct. 439, 440 (1986). As another, we remember that success does not justify extravagance. See *Society of Jesus of New England* v. *Boston Landmarks Commn.*, 411 Mass. 754, 758-761 (1992) (reducing a claim for appellate fees of $142,760.88 to an allowance of $53,959.88). Reasonable fees and costs for a prevailing party do not include compensation for unnecessary or ineffectual activity. The fees seeker must show the utility of the services.

Section 29 specifies two criteria for measurement of reasonable fees: the results accomplished and time spent. See note 5, *supra.* The result accomplished was optimum: judgment for the full requested sum of damages ($35,910) plus interest and costs. As to time spent, the judge sheared off 207.9 hours and $38,226.25 in fees requested by City Rentals for three episodes of preparation for failed trial dates; and 39.3 hours and $9,032.50 for preparation of a very late posttrial memorandum.

In addition the judge reported that she had examined all the activities submitted by counsel (132 pages of itemized time sheets) and had examined the request under the light of the common-law criteria of *Linthicum* v. *Archambault*, 379 Mass.

---

[12]As the judge observed, "This [c]ourt, having made various pre-trial orders in anticipation of the jury-waived trial and having presided at the trial, is in a position to evaluate [reasonable compensation for] preparation for the trial."

381, 388-389 (1979).[13] In particular she commented that "the proceeding was not a simple payment bond dispute" because it presented multiple questions of the application of § 29.

The fee award has substantially outdistanced the damages judgment. That circumstance by itself does not compel a reduction of the fee amount. Several § 29 cases have produced that configuration because the expenditure of legal time and effort was reasonable in the circumstances. See, e.g., *Atlantic Pipe Corp.* v. *R.J. Longo Constr. Co.*, 35 Mass. App. Ct. 459, 461-462 (1993) (principal recovery of $69,409.87; award of fees of $172,924); *J.P. Constr. Co.* v. *Stateside Builders, Inc.*, 45 Mass. App. Ct. at 921 (damages of $29,095.38; fees award of $39,583). While at first glance, the fees tail may appear to be wagging the damages dog, both the complexity of a case — factual or legal — and the intensity of the defense may drive the claimant's legal fees well beyond the level of its damages figure. In this case the record does indicate that BBC staunchly fought the claim. In that situation, a disproportionate fee allowance can become the foreseeable price of the choice to wage a Pyrrhic defense against a claim of moderate size and respectable merit.[14] Finally, the purpose of the provision is to make the wronged subcontractor or supplier whole. A judgment denying it compensation for genuinely necessary fees because they exceed its damages would fail that purpose.

For these reasons we affirm the bulk of the judge's award with only two adjustments. The judge granted City Rentals's requests for fees of $4,125 for work applied to claims against Kevton as an original codefendant, and of $2,669.50 for work upon City Rentals's failed c. 93A claim against BBC. Those

---

[13] "While the amount of a reasonable attorney's fee is largely discretionary, the judge . . . should consider the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases."

*Linthicum* v. *Archambault*, 379 Mass. at 388-389.

[14] A defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *Riverside* v. *Rivera*, 477 U.S. 561, 581 n.11 (1986), quoting from *Copeland* v. *Marshall*, 641 F.2d 880, 904 (D.C. Cir. 1980).

services did not contribute to the successful § 29 claim and should not be compensable. We therefore order the subtraction of $6,794.50 from the fee award.

3. *Appellate attorney's fees.* The fee shifting entitlement of § 29 extends to the appellate process. See *Manganaro Drywall, Inc.* v. *White Constr. Co.*, 372 Mass. at 667; *J.P. Constr. Co.* v. *Stateside Builders, Inc.*, 45 Mass. App. Ct. at 921; *Framingham Heavy Equip. Co.* v. *John T. Callahan & Sons, Inc.*, 61 Mass. App. Ct. 171, 181 (2004). City Rentals has included within its brief a request for those attorney's fees. If the parties cannot agree upon appropriate amounts of fees, they must follow the process prescribed in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004). City Rentals will submit its request to this court, with supporting materials, within fourteen days of the date of the rescript. BBC and Centennial will submit their opposition within ten days thereafter.

*Conclusion.* The judgment is affirmed. The order awarding attorney's fees shall be reduced by $6,794.50 and, as so modified, is affirmed.

*So ordered.*